ATS, Inc., and ATS, Inc. of Georgia (hereinafter collectively referred to as "ATS") appeal from a judgment entered on a jury verdict in favor of the plaintiffs, Glenn Beddingfield and Stephanie Beddingfield, Roger Nash and Tami Nash, and Leo Byrtice Crawford (hereinafter collectively referred to as "the plaintiffs"). ATS argues that it was entitled to a judgment as a matter of law on the plaintiffs' vicarious-liability claims based on the loaned-servant doctrine.[1] We reverse and remand.
 I.
ATS is an employee-leasing company; it contracts with small businesses to consolidate their employees into a single entity for purposes of providing payroll services and benefits such as medical insurance, retirement plans, and workers' compensation. Under those contracts, the employees of the small businesses become employees of ATS. Thereafter, ATS leases the employees back to its customer — the small business. This arrangement is essentially one of form instead of substance. That is, ATS's leasing contract does not otherwise alter an employee's job responsibilities or supervisory setting at the customer's business.
Mercer Trucking, Inc., a Georgia corporation ("Mercer Trucking"), became an ATS customer in 1997. Erwin Mercer, president of Mercer Trucking, became interested in the employee-leasing concept as a way to provide his drivers with workers' compensation benefits and to reduce some of the payroll duties associated with running a business. ATS and Mercer Trucking entered into a "Personnel Payroll Service Agreement" on April 16, 1997.[2] This agreement provided, in relevant part:
 "2. ATS, Inc. of Georgia will pay the employee's wages, provide any applicable benefits, and will pay all applicable federal and state taxes with respect to the employment of such personnel including social security, [and] federal and state unemployment compensation taxes. ATS, Inc. of Georgia further will maintain payroll records and reports for all employees.
 "3. ATS, Inc. of Georgia will procure and maintain Worker's Compensation Insurance on all personnel supplied [to Mercer Trucking] hereunder as required by applicable law . . . .
". . . .
 "5. Work related instructions of personnel will be handled by [Mercer Trucking] personnel."
(Emphasis added.)
Mercer retained primary responsibility for hiring and firing drivers in *Page 1134 
the same manner as he had before Mercer Trucking entered into the payroll-service agreement with ATS. That is, Mercer chose the drivers ATS employed and leased back to Mercer Trucking. Because ATS was technically the employer of Mercer Trucking's drivers, it did have the authority to fire any of the drivers at will. However, the president of ATS testified that he never exercised this authority with any of ATS's customers. Instead, ATS removed employees from its payroll only at the direction of the business that was its customer.
As an additional service, ATS sponsored safety meetings for its payroll-service customers at no additional cost. The safety meetings were tailored to a customer's business and were provided only at a customer's request. ATS conducted one such safety meeting on Mercer Trucking's behalf on December 1, 1997.
In May 1999, Roger Walker responded to a newspaper advertisement, which stated that Mercer Trucking was looking for truck drivers. On May 22, 1999, Walker had an interview with Mercer at Mercer Trucking. After Walker filled out some paperwork and took a road test to assess his driving abilities, Mercer hired Walker. At this time, Mercer explained to Walker that he would be an employee of ATS but that Walker would still receive orders from Mercer.
Mercer also gave Walker ATS's employment policies manual, which ATS had prepared exclusively for Mercer Trucking. This manual contained rules and regulations that all ATS employees working for Mercer Trucking were expected to follow. Those rules set forth the duties required of ATS employees in their "general conduct" of Mercer Trucking's business. Mercer Trucking, as a payroll-service customer, was primarily responsible for enforcing those employment policies.
One of the documents Walker signed on his date of hire was an "Acceptance of Employment" form that contained the following provision:
 "I, Roger D. Walker, do hereby accept employment with ATS, Inc. of Georgia, with the following express understanding [sic] agreements [sic]:
 "I do expressly acknowledge, agree, and understand that I am to be employed solely by ATS, Inc. of Georgia, and that, although I may be under some day-to-day supervision from someone other than ATS, Inc. of Georgia, I hereby expressly do not consent to any employer-employee relationship with any other party. I further expressly object to, and reject being a special or other classification of employee, either expressly or by implication, of anyone other than ATS, Inc. of Georgia."
(Emphasis added.)
May 26, 1999, was Walker's first day driving for Mercer Trucking. Walker received instructions directly from Mercer as to where he should pick up and drop off loads. Walker telephoned Mercer for instructions each time he finished unloading his truck.
On May 27, 1999, Walker dropped off a truckload of cargo at Tom's Potato Chips in Knoxville, Tennessee. After unloading, Walker telephoned Mercer for further instructions. Mercer told Walker to drive to Chattanooga for a possible pickup. Walker drove south on Interstate 75 toward Chattanooga. Seeing a sign warning of road work ahead, Walker slowed his truck to 50 miles per hour. Walker then realized that the traffic ahead of him had stopped, and he started to brake. Walker attempted to maneuver his truck into the emergency lane, but it continued to slide forward and collided with a minivan *Page 1135 
stopped in the traffic. All four occupants in the minivan were killed.
Walker telephoned Mercer to report the accident. Walker had no contact with anyone at ATS regarding the accident. As of the day of the accident, ATS had not yet received from Mercer Trucking Walker's hiring forms and related paperwork.
In January 2000, the plaintiffs, as personal representatives of the estates of the deceased victims, initiated wrongful-death actions against Walker, Mercer Trucking, ATS, and other defendants[3] in the Jefferson Circuit Court.[4] The plaintiffs asserted claims against both ATS and Mercer Trucking of (1) negligence and recklessness under the doctrine of respondeat superior and (2) negligent and reckless hiring. On April 3, 2001, ATS moved for a summary judgment. On August 2, 2001, the trial court denied ATS's motion.
On October 29, 2001, a jury trial began. The trial court split the trial into three phases. Phase one was to address the negligence and recklessness claims against Walker and the vicarious-liability claims against ATS and Mercer Trucking; phase two was to address the negligent-and reckless-hiring claims against ATS and Mercer Trucking and to assess, if necessary, the amount of compensatory damages; and phase three, if it became necessary, was to address the amount of punitive damages.
During phase one, ATS moved for a judgment as a matter of law ("JML") both at the close of the plaintiffs' evidence and at the close of all the evidence. The trial court denied each motion and submitted interrogatories to the jury. The jury answered the special interrogatories, finding that Walker's conduct was negligent and reckless and that both ATS and Mercer Trucking were vicariously liable for Walker's conduct.
During phase two, the jury found that ATS and Mercer Trucking were not liable on the negligent-and reckless-hiring claims. The jury also assessed compensatory damages in the amount of $9.5 million for all four victims.[5] ATS then moved for a JML on the issue of punitive damages. The trial court denied the motion, and the trial proceeded to its third and final phase. During phase three, the jury assessed punitive damages against Walker, Mercer Trucking, and ATS in the aggregate sum of $15 million.
On November 9, 2001, the trial court entered a judgment on the jury's verdict. On December 7, 2001, ATS moved for a JML or, alternatively, for a new trial. ATS simultaneously moved the trial court to evaluate the punitive-damages award. On May 16, 2002, the trial court denied ATS's outstanding postjudgment motions.[6] ATS filed a timely notice of appeal.
 II.
We have clearly stated the standard for appellate review of a trial court's ruling on a motion for a JML: *Page 1136 
 "The standard of review applicable to a ruling on a [renewed] motion for [a JML] is identical to the standard used by the trial court in granting or denying a motion for [a JML]. Thus, in reviewing the trial court's ruling on the motion, we review the evidence in the light most favorable to the nonmovant, and we determine whether the party with the burden of proof has produced sufficient evidence to require a jury determination.
". . . .
 ". . . In ruling on a [renewed] motion for a [JML], the trial court is called upon to determine whether the evidence was sufficient to submit a question of fact to the jury; for the court to determine that it was, there must have been `substantial evidence' before the jury to create a question of fact. '[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer that the existence of the fact sought to be proved. . . .'"
American Nat'l Fire Ins. Co. v. Hughes, 624 So.2d 1362, 1366-67 (Ala. 1993) (citations omitted).
 III.
ATS argues that under the loaned-servant doctrine it is not vicariously liable for Walker's negligent and reckless actions. We agree.
Because the accident giving rise to this action occurred in Tennessee, the parties agree that the substantive issues in this case are governed by Tennessee law. Under Tennessee law, an employer is liable for an employee's negligence based solely upon the doctrine of respondeat superior. Smith v. Henson, 381 S.W.2d 892, 897 (Tenn. 1964). To determine whether a master-servant or employer-employee relationship exists, "control is a key element." Armoneit v. Elliott Crane Serv., Inc.,65 S.W.3d 623, 629 (Tenn.Ct.App. 2001). Unlike Alabama, "[i]n Tennessee, the right to control the result is not determinative of the existence of the relation of master and servant, but the actual control of means and methods is." Id. (citing McDonald v. Dunn Constr. Co., 182 Tenn. 213,220, 185 S.W.2d 517, 520 (1945)).
Under the loaned-servant doctrine, "[a]n employee of one employer may become the servant of another and shift the liability for his negligent acts to the second employer." Parker v. Vanderbilt Univ., 767 S.W.2d 412,416 (Tenn.Ct.App. 1988). In Gaston v. Sharpe, 179 Tenn. 609, ___,168 S.W.2d 784, 786 (1943), the Supreme Court of Tennessee adopted theRestatement of Agency view in fashioning a test to determine whether an employee of one employer is the loaned servant of another employer:
 "`Since the question of liability is always raised because of some specific act done, the important question is not whether or not [the employee] remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other. It is not conclusive that in practice he would be likely to obey the directions of the general employer in the case of conflict of orders. The question is as to whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed in the business of and subject to the direction of the temporary employer as to the details of such act. This is a question of fact in each case.'"
As the above rule acknowledges, whether an employee of one becomes the loaned servant of another is a question of fact. Id. However, in this case, there is no conflicting evidence as to where authority to *Page 1137 
direct the specific act that caused the deadly accident lay.
First, the authority vested in Mercer Trucking as to its leased employees is set forth in the payroll-service agreement between Mercer Trucking and ATS. "The interpretation of an unambiguous written agreement is a question of law for the court." Parker, 767 S.W.2d at 417. InParker, the Tennessee Court of Appeals, applying the test set forth inGaston and relying on the terms of an unambiguous agreement between Vanderbilt University and a local hospital, held that a doctor was the loaned servant of the hospital. Id. Pursuant to the agreement, Vanderbilt University provided the local hospital with surgical residents. The agreement specifically provided that the residents, as members of the hospital's surgical staff, were accountable solely to the hospital.
Similarly, in this case, the payroll-service agreement between Mercer Trucking and ATS states that Mercer Trucking was responsible for providing any "work related instructions" to its leased personnel. On May 27, 1999, Mercer, exercising the authority vested in him by the payroll-service agreement, instructed Walker to proceed to Chattanooga for a possible pickup on Mercer Trucking's behalf. While Walker was en route to Chattanooga, he was "acting in the business of and under the direction of [Mercer]." Gaston, 179 Tenn. at ___, 168 S.W.2d at 786. Thus, under the Gaston test, Walker was acting as the loaned servant of Mercer Trucking at the time of the fatal accident.
The plaintiffs argue that because Mercer Trucking did not provide Walker with specific instructions as to how to drive the truck, Walker cannot be deemed to be a loaned servant of Mercer Trucking. They claim that ATS retained responsibility for training and supervising the drivers it leased, and that, therefore, ATS retained authority over the specific act that caused the accident, namely, Walker's driving. In support of this argument, the plaintiffs point to the employment policies manual Walker received when he was hired.
Contrary to the plaintiffs' suggestion, the manual does not contain any instructions on how to drive a truck. The manual actually directs employees to communicate with Mercer Trucking, not with ATS, "for matters pertaining to [their] dispatch." Walker's driving caused the accident, not his failure to perform the general tasks described in the manual, and it is Walker's driving, not ATS's retention of control regarding Walker's general conduct in performing Mercer Trucking's business, that is relevant to this analysis. Gaston, 179 Tenn. at 614-15, 168 S.W.2d at 786.
Moreover, on the date of the accident, it was impossible for ATS to have been exercising any actual control over Walker, because at that time ATS was unaware that Mercer had hired Walker and, in turn, that Walker had thereby become one of ATS's employees.[7] Therefore, the plaintiffs' argument that Walker was under the day-to-day supervision of ATS is not supported by the record.[8] *Page 1138 
 IV.
We conclude that, as a matter of law, Walker was the loaned servant of Mercer Trucking at the time of the accident, and, therefore, that ATS is not liable for Walker's negligent and reckless actions. The trial court's order denying ATS's motion for a JML is reversed, and this cause is remanded to the trial court to enter a judgment in favor of ATS consistent with this opinion.
1011474 — REVERSED AND REMANDED.
1011475 — REVERSED AND REMANDED.
1011476 — REVERSED AND REMANDED.
HOUSTON, LYONS, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
[1] ATS raises additional arguments on appeal; however, because resolution of the loaned-servant issue is dispositive, we will not address those additional arguments.
[2] In addition to its payroll-service agreement, ATS also offered a full-service agreement, although it did not offer this type of agreement in Georgia. Under a full-service agreement, ATS recruited and hired employees for its customers, performed background checks, and ensured compliance with certain federal regulations.
[3] We have omitted names of the remaining defendants for purposes of simplification. ATS is the only defendant that is a party to this appeal.
[4] The four decedents were residents of Jefferson County, Alabama.
[5] Tennessee law governs the substantive issues in this case. See
Part III of this opinion. Tennessee law provides for compensatory damages in a wrongful-death action. See Tenn. Code Ann. § 20-5-113 (2002).
[6] The plaintiffs and ATS consented to an extension of the 90- day period provided in Rule 59.1, Ala.R.Civ.P., during which a postjudgment motion may remain pending.
[7] The plaintiffs claim that Mercer acted as ATS's agent for purposes of recruiting, hiring, and interviewing drivers. The plaintiffs, however, misstate the parties' relationship. Mercer Trucking contracted with ATS to provide it with payroll services only. It, and not ATS, retained control over which drivers it hired to drive its trucks. Because Mercer Trucking never gave ATS authority to act on its behalf with respect to hiring decisions, ATS could not vest in Mercer, as one of ATS's agents, authority with respect to such decisions.
[8] The plaintiffs argue that the employment-acceptance form Walker signed prohibited him from being classified as a loaned servant of Mercer Trucking. However, "proper analysis must be geared toward the substantive relationship, rather than the formal, nominal procedural acts that might be observed in the relationship." Catlett v. Indemnity Ins. Co. of NorthAmerica, 813 S.W.2d 411, 416 (Tenn. 1991). Cf. United States v. Boyd,211 Tenn. 139, 155, 363 S.W.2d 193, 200 (Tenn. 1962) ("The mere placing of terms such as agent or independent contractor in the contract does not make them such in the law. The surrounding facts and circumstances determine the relationship.").